

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

January 11, 2022

**BY ECF**

The Honorable Nelson S. Román
United States District Court
Southern District of New York
300 Quarropas St.
White Plains, NY 10601

> **Re:** *United States v. Nicolaus Wynberg*, **20 Cr. 386 (NSR)**

Dear Judge Román:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for February 10, 2022, at 1:00 p.m. Wynberg fired guns and detonated explosives in a residential area, attempted to unlawfully acquire significant quantities of ammunition, and threatened to kill others. He amassed a stockpile of explosives, guns, and other weapons that he used to threaten, intimidate and terrify his neighbors, who were devastated by his actions. For these and other reasons explained below, the Government submits that a sentence above the stipulated Guidelines range of 41 to 51 months (the "Guidelines Range"), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I.    Factual Background

From in or about February 2020 until his arrest in or about July 2020, Nicolaus Wynberg, prohibited from possessing firearms due to a prior felony conviction, amassed guns, ammunition, homemade bombs, bomb-making equipment and other weaponry in a trailer on his landlord's property in Stanfordville, New York (the "Property"). PSR ¶ 11. As described further below, he used these weapons to, among other things, threaten others by detonating homemade bombs and pointing a firearm at a victim's head.

### Wynberg Fired Rifles and Detonated Explosives in a Residential Area

As a felon, Wynberg was prohibited from possessing firearms or destructive devices. On September 28, 2016, in Ulster County Court, Wynberg was convicted of criminal possession of a firearm, a crime punishable by a term of imprisonment exceeding one year. PSR ¶ 20. That same day, Wynberg was sentenced to a term of 16 months to four years' imprisonment, and served approximately 22 months' imprisonment. PSR ¶ 22.

As set forth in the Complaint and PSR, two witnesses ("Witness-1," "Witness-2," and together, the "Witnesses") saw Wynberg firing ammunition on multiple occasions from multiple

firearms at or near the Property. PSR ¶ 11. For instance, Wynberg kept an "AR" style rifle, which he fired on multiple occasions, including at metal targets in the backyard of the Property. *Id.* The buildings on the Property, including the main house, Wynberg's trailer and a shed, were clustered together in close proximity.

The Witnesses also observed Wynberg detonating explosive devices on the Property and heard Wynberg talking about manufacturing explosive devices, some of which, according to Wynberg, he activated using cellphones. In or about May or June 2020, Witness-1 observed Wynberg test an explosive in the backyard of the Property. PSR ¶ 12. Also in or about May or June 2020, Witness-2 observed Wynberg remotely detonate an explosive device that appeared to consist of a pipe with wires protruding from it. PSR ¶ 18. The remote control Wynberg used to detonate the device was easily concealable—smaller than a cellphone and approximately the size of a garage door opener. *Id.* Wynberg also detonated other explosive devices outside his trailer. *Id.* In June 2020, Wynberg showed Witness-1 what appeared to be an explosive device that he had built. *Id.* Wynberg claimed that he could detonate the device from up to five miles away with either his cellular telephone or a remote control. *Id.* Wynberg failed to register any destructive device with the Department of the Treasury. PSR ¶ 20.

Wynberg Attempted to Unlawfully Acquire a Firearm and Significant Quantities of Ammunition

As noted above, as a felon, Wynberg could not lawfully purchase or possess firearms or ammunition. In or about March or April 2020, Wynberg asked Witness-2 to purchase 5,000 rounds of 5.56mm ammunition for Wynberg. PSR ¶ 17. Around the same time, Wynberg asked to purchase a .22 caliber rifle from Witness-2. *Id.* Wynberg also asked Witness-2 to purchase ammunition-reloading equipment and give it to Wynberg. *Id.* Witness-2 declined to purchase the ammunition or ammunition-reloading equipment for Wynberg and declined to sell Wynberg the rifle. *Id.* Wynberg boasted about having a rifle that fired multiple types of ammunition. PSR ¶ 16.

Wynberg Threatened to Kill Others

Wynberg made violent threats—including threatening to indiscriminately kill others to reduce the population and threatening to specifically kill Witness-2 while pointing a gun to Witness-2's head. Specifically, in 2020, Wynberg declared to Witness-2 that the United States was overpopulated and that Wynberg wanted to use violence to reduce the population. PSR ¶ 16. Wynberg discussed killing people with firearms and explosives. *Id.* In June 2020, Wynberg, in anger, pointed a handgun at Witness-2's head. PSR ¶ 19. The handgun was a black pistol with a laser sight mounted on the underside of the barrel. *Id.* Wynberg sent the following message to Witness-1:

> I suggest you leave me alone and keep [Witness-2] away from me. If I feel threatened or worse, harmed in any way, you will not bear the burden of punishment, that's far too easy... no no, someone you love or care about deeply will pay the debt for your transgression.... My wrath however is without conscience. I'm a fucking monster and everything that I destroy in the world that spoiled, entitled ignorant capitalist consumer [sic] enjoy, is a

little bit that I can give to soothe the soul of that little girl who took my soul
when I took her life. . .

(Def. Mem. Ex. 1 at 10.)

<u>Law Enforcement Seized a Stockpile of Explosives, Guns, and Other Weapons</u>

During a search of outbuildings on the Property used by Wynberg, pursuant to a warrant,
law enforcement recovered, among other things, two pipe bombs capable of detonating, precursor
chemicals including tannerite and component parts for further explosives, a handgun and a long
gun (neither of which had a serial number), pellet guns, knives, a camouflage bow, and ammunition
of multiple calibers (in boxes, loose and in magazines).  *See* Ex. A to Plea Agreement (listing
forfeited items).  In total, Wynberg possessed at least four firearms, which included at least two
explosive devices.  PSR ¶ 22.  The following are selected photos taken by law enforcement during
the search:



*Recovered pistol*



*Recovered rifle*



*Recovered ammunition magazines*



*Recovered bag containing pipe bombs*



*Recovered pipe bomb (1 of 2)*



*Recovered pipe bomb (2 of 2)*

## II.      The Plea and Guidelines Calculation

The defendant was charged by Complaint on July 15, 2020, arrested on July 16, 2020, presented on July 17, 2020 and ordered detained.  On or about July 28, 2020, a grand jury returned an Indictment charging the defendant with one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1), and then on or about November 9, 2020, returned a three-count Superseding Indictment, charging the defendant with unlawful manufacture of an explosive device in violation of 26 U.S.C. §§ 5822, 5861(f) and 5871, unlawful possession of an explosive device in violation of 26 U.S.C. §§ 5861(d) and 5871, and being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).

On September 29, 2021, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pleaded guilty to Count Two of the Superseding Indictment.  Count Two charges the defendant with unlawful possession of a destructive device in violation of 26 U.S.C. §§ 5861(d) and 5871.  As stated in the Plea Agreement, the defendant's stipulated range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 41 to 51 months' imprisonment, based on an offense level of 21 and a criminal history category of II.  An increase in offense level was warranted because the offense involved between three and seven firearms, and the offense involved an explosive device.  PSR ¶ 6.

## III.     Presentence Investigation Report and Probation's Recommended Sentence

The United States Probation Office calculates the applicable Guidelines as 41 to 51 months' imprisonment, based on an offense level of 21 and a criminal history category of II.  Dkt. No. 42 at 18.  That calculation is consistent with the Guidelines Range set forth in the Plea

Agreement.  The Probation Office recommends a custodial sentence of 41 months, followed by two years of supervised release.

## IV.   Discussion

### A.  Applicable Law

The Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

### B.  An Above Guidelines Sentence Is Warranted in this Case

The Government respectfully submits that the application of the statutory sentencing factors set forth in Title 18, United States Code, Section 3553(a) weighs in favor of a sentence above the stipulated Guidelines Range of 41 to 51 months' imprisonment.  The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, and to promote respect for the

law.  18 U.S.C. § 3553(a)(2)(A)-(C).  Here, the stipulated Guidelines range does not adequately account for the danger posed by the defendant – who was armed with bombs, guns and ammunition, and motivated by an ideology of violence – or the harm done to his victims.

*First*, the defendant's conduct was extremely harmful, and so dangerous it could have resulted in far more damage.  Forbidden from possessing firearms or ammunition after a prior felony weapons conviction, Wynberg nonetheless stockpiled them, packing his trailer full of bullets, guns and explosives.  In addition to the pipe bombs he built, Wynberg's destructive arsenal included a handgun with no serial number, a long gun with no serial number, knives, a camouflage bow, pellet guns, loaded ammunition magazines, and boxes of live ammunition of multiple calibers.    Not only did he possess these weapons, he used them to frighten and intimidate.  Wynberg detonated bombs near his landlord's residence.  He repeatedly fired guns near his landlord's and neighbors' homes.  He pointed a handgun at someone's head and threatened to kill him, and pointed another gun at his landlord's chest.  While Wynberg was arrested before he physically injured anyone, his conduct terrified others, and required a substantial, urgent law enforcement response.  The defendant's statements – including his threats to indiscriminately kill people to reduce the population – conveyed his violent and dangerous nature.  The Guidelines only account for his possession of the weapons and not the manner in which he threatened, intimidated, and terrified his neighbors.

In statements attesting to the devastating impact Wynberg had on their lives (*see* victim statements, attached hereto as Exhibit 1), Wynberg's neighbors recount how Wynberg threatened, intimidated and terrified them, forcing them from their homes in fear of what he might do to them.  Witness-1 recounted that Wynberg "put a loaded rifle to my heart and said he wanted to see how I would react. He also held a handgun to one of my friends head and a loaded crossbow at his chest."  Wynberg repeatedly "scared everyone at my property including the neighbors," which he achieved through various means, including walking through the neighborhood at night, "carrying a large laser he made burning what he could."  As the behavior escalated, Witness-1 "started staying away from home more and more. He worried me with his ideas and threats."  Threatening behavior included stories Wynberg would tell about harm done to others, including that "he poisoned his mother but only damaged her immune system. He said he wanted to complete the job of killing her."  When Wynberg was angry, "he would go into the yard and with his automatic weapon he would make his dissatisfaction clear by shooting many, many rapid rounds of bullets. It got to the point he would be in his camper and shoot through the walls toward the house. There were bullet holes shot thru the walls of the camper and bullet holes in my house."  The result was devastating to Witness-1, completely disrupting her life:  "I lived in that home for 21 years of peace and happiness. He took all that away. I had all my friends there and people I know and groups I participated in. I was so worried he would come back and exact his revenge on me or the people I care for that I felt it necessary to sell and move."  Ex. 1 at 2-3.

A friend of Witness-1, who resided in the same house on the Property, confirms that Wynberg made their lives a "living nightmare."  The friend describes enduring Wynberg's "near daily shooting," as well as the apprehension that "he could blow us all up at any time" with his explosive devices.  Wynberg "would brag about how big a hole his bombs could make. My thought was, if he makes a mistake, we'll go with him."  The result was that Wynberg "made me feel unsafe in my own home. I took to staying home most all of the time because I worried about

what he might do if I wasn't home."  The friend describes the permanent disruption Wynberg caused, as the friend had "been living in that home for over ten years and had felt safe. I loved that home but Nick ruined that for us. I still live in fear that he might get out and find us." *Id.* at 5-6.

Witness-2, an elderly retiree, recounts Wynberg's threats: "Nicolaus Wynberg threatened to kill me if I turned him in for making guns and bombs. Nick twice pointed a loaded gun at my head and said is [sic] what will happen if you cross me."  The impact of Wynberg's conduct would last far beyond his arrest:  "Nick's actions make it necessary for me to move, in the hope he will not be able to keep his promise of killing me the first chance he gets." *Id.* at 8.

The victims report that he further terrorized them by going into their residences without permission and stealing personal and sentimental belongings—including dumping a loved one's ashes. *Id.* at 2-3; 5-6.  A friend of Witness-1 and longtime criminal defense lawyer, who both knew Wynberg and saw the impact of his conduct on Witness-1, assessed that, in decades of practice, "I never encountered any individual that I considered as dangerous as Mr. Wynberg." *Id.* at 7.  The fear Wynberg's victims continue to feel ("I still live in fear that he might get out and find us") is a powerful testament to the danger he poses to the community.

*Second*, a sentence above the Guidelines Range is necessary to afford adequate deterrence to the defendant and others similarly situated and promote respect for the law.  Such a sentence is appropriate given that the defendant has a prior conviction for criminal possession of a firearm, served a considerable prison sentence, and still was not deterred.  A sentence above the Guidelines Range would send a message to the defendant and others that the conduct the defendant engaged in will not be tolerated.  The creation of destructive devices is exceptionally dangerous in any circumstance.  But Wynberg used these devices to terrify and intimidate.  It would also signal to others in the defendant's position that whatever personal advantage an individual might seek through possessing large amounts of high-powered weaponry, such activity is not worth the risk.

*Third*, the defendant's arguments for leniency should be rejected.  The defendant argues that he has maintained steady employment while in jail.  But the fact that he possessed substantial quantities of weaponry, including explosives, firearms and ammunition, threatened others, and expressed an ideology that involved reducing the number of people in the country through violence, casts a long shadow on every other aspect of his record.

Likewise, though the psychiatric report submitted by the defense sets forth the challenges the defendant faces, it remains abundantly clear that the defendant's conduct was voluntary. Although the defense claims that he was "overmedicated" on Adderall when he committed his crimes, which they assert led to an increase in his paranoia, his use of this medication was as prescribed, and only started on June 25, 2020, long after he had asked Witness-2 for help purchasing large amounts of explosive material and ammunition. *See* Def. Mem., Ex. A, at 27. By the psychiatrist's own analysis, Wynberg was exhibiting violent tendencies at least as far back as 2013, and since then, whether medicated or not, in treatment or out of it, he has continued a destructive pattern.  Wynberg's illegal amassing of his arsenal was exacerbated by a violent belief system: he believed that the country was overpopulated and violence was the answer.  PSR ¶ 16. Luckily, the FBI arrested Wynberg before he could put this philosophy into action by using his untraceable firearms and homemade bombs to achieve those ends.  Such views, however,

exemplify the danger that the defendant—who was willing to point a handgun at someone's head and a loaded rifle at someone's heart—poses to society and the need for a substantial sentence to ensure the safety of the community.

In sum, a sentence above the stipulated Guidelines Range is necessary to reflect the severity of the defendant's conduct; protect the public from future crimes of the defendant; and adequately deter both the defendant and others.

### V.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant above the stipulated Guidelines Range of 41 to 51 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: __/s/ T. Josiah Pertz_____
T. Josiah Pertz / Kyle A. Wirshba
Assistant United States Attorneys
(914) 993-1966

cc:  Steven Lewis, Esq. (ECF)