```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------------x
 3  UNITED STATES OF AMERICA,
 4
                                   7:20-CR-00386-1 (NSR)
 5      -vs-
                                   SENTENCING
 6
    NICOLAUS WYNBERG,
 7
                          Defendant.
 8  ------------------------------------x
 9                             United States Courthouse
                               White Plains, New York
10
                               Thursday, February 10, 2022
11                             1:00 p.m.
12
    B e f o r e:
13
                               HONORABLE NELSON S. ROMÀN,
14                             District Judge
15
16  A P P E A R A N C E S:
17
    DAMIAN WILLIAMS
18      United States Attorney for the
        Southern District of New York
19  T. JOSIAH PERTZ,
    KYLE A. WIRSHBA,
20      Assistant United States Attorneys
21
    STEPHENS, BARONI, REILLY & LEWIS, LLP
22  STEPHEN R. LEWIS, ESQ.
        Attorney for Defendant
23
24  ALSO PRESENT:
25  DOMINIC TRIPPODO, Special Agent, FBI
```

1              THE DEPUTY CLERK:  Docket number S-1, 20-CR-386,

2  United States of America versus Nicolaus Wynberg.

3              Will Counsel please state their appearance for the

4  record, beginning with the Government.

5              AUSA PERTZ:  Josiah Pertz for the United States, and

6  with me at counsel table is Special Agent Dominic Trippodo of

7  the FBI.  Good afternoon, your Honor.

8              THE COURT:  Good afternoon.  Is this the first time

9  you appeared before me physically?

10             AUSA PERTZ:  Either the first or second.

11             THE COURT:  Oh, okay.  Because you have a very

12 distinct voice.  The minute you started speaking, I recognized

13 the voice, but I don't recall whether or not you appeared

14 physically before me, so...nice to see you in person.

15             AUSA PERTZ:  Likewise.

16             THE COURT:  All right?

17             And I apologize, Counsel, Mr. Lewis, you can remain

18 seated.  You're also dressed nicely and I appreciate the --

19             MR. LEWIS:  Tall and fit?

20             THE COURT:  Ha, ha, ha.  Just -- it would be helpful

21 if you remain seated.  It just makes things run a lot smoother.

22 Also, I'm trying to comply with all these distancing protocols

23 and so forth to protect everyone.

24             You can give your appearance on the record, sir, Mr.

25 Lewis.

Sentencing                    USA v. Wynberg                              3

```
 1              MR. LEWIS:  Judge, Stephen Lewis, appearing with
 2  Nicolaus Wynberg today.
 3              THE COURT:  All right.  Good afternoon, everyone.
 4              This is a proceeding in the matter of United States v.
 5  Nicolaus Wynberg, Docket No. 20-CR-386, and it is intended to be
 6  the sentencing of the Defendant.
 7              I have reviewed the pre-sentence investigation report
 8  dated November 24th, 2021, revised on December 22nd, 2021, which
 9  was prepared in connection with today's sentencing of Mr.
10  Wynberg; the Defendant's submission dated December 22nd, 2021,
11  dated -- I'm sorry, submission dated December 20, 2021, and the
12  submissions dated December 27, 2022, and submissions dated
13  February 1st, 2022; and the Government submissions dated January
14  11th, 2022, January 25th, 2022, and January 29th, 2022.  A lot
15  of submissions, all right.
16              Has the Government reviewed the pre-sentence report?
17              AUSA PERTZ:  We have.
18              THE COURT:  And does the Government have any
19  objections to the pre-sentence report?
20              AUSA PERTZ:  We do not.
21              THE COURT:  All right.
22              Mr. Lewis, have you had an opportunity to review the
23  pre-sentence report?
24              MR. LEWIS:  Judge, I have.
25              THE COURT:  And did you have an opportunity to discuss
```

 1  it with your client Mr. Wynberg?

 2          MR. LEWIS:  Yes, I have, Judge.

 3          THE COURT:  Do you have any objections to the report

 4  that you wish to raise at this time?

 5          MR. LEWIS:  Judge, I have two objections to the

 6  factual recitations in the report, the first is at paragraph 59.

 7          THE COURT:  Let me get there...okay.  I'm at paragraph

 8  59.

 9          MR. LEWIS:  Okay.  And towards the bottom, four lines

10  up, it indicates the Defendant was prescribed Adderall 30

11  milligrams.  That's incorrect.  And as my submissions have

12  indicated, both the December submission and also the January

13  submission, which list his medications, he was receiving 120

14  milligrams.  That's 30 milligrams, but four times a day.

15          THE COURT:  All right, so basically do you want the

16  report to reflect that he was prescribed Adderall 30 milligrams

17  four times a day?

18          MR. LEWIS:  That's all, sir.  Yes.

19          THE COURT:  Okay.

20          Does the Government have any objection to that

21  modification?

22          AUSA PERTZ:  No, your Honor.

23          THE COURT:  Okay, so the report will be amended as

24  requested and as indicated by the Court.  Okay?

25          MR. LEWIS:  And, Judge?  There's just one other

1  factual correction that's being requested at paragraph 63.

2          THE COURT:  Okay.

3          MR. LEWIS:  It indicates that Dr. Bardet in his report

4  stated that Mr. Wynberg was abusing prescription medication.

5  That's inaccurate.  And it was a misread by the probation

6  officer, obviously, because he indicates just the opposite in

7  his...in his report, that he was not abusing his prescription

8  medication, and that's why I'm -- I referenced it on page 5 of

9  my December 22nd submission to the Court where it says Dr.

10 Bardet's report states at page 5, he denied using his prescribed

11 medications.

12         THE COURT:  Okay, so the modification would be to

13 redact everything that follows the word "beverages"?  The

14 sentence would end there.  Meaning that...

15         MR. LEWIS:  Yes, Judge.

16         THE COURT:  It would reveal that Wynberg abused

17 alcoholic beverages, period.

18         Does the Government have any questions to that

19 modification?  Meaning so the last three words would be redacted

20 from paragraph 63 of the pre-sentence report.

21         AUSA PERTZ:  No objection.

22         THE COURT:  Okay.

23         Any other objections, Mr. Lewis?

24         MR. LEWIS:  No, sir.

25         THE COURT:  All right.  Because if I'm not mistaken, I

1  thought you were objecting to paragraphs 16 through 20.

2          (Extended pause)

3          THE COURT:  Mr. Lewis.

4          MR. LEWIS:  Judge, the difficulty that exists here is

5  that he has absolutely no recollection of saying any of those

6  things, but I don't know how to address it because --

7          THE COURT:  Well, basically what we will do is -- the

8  question is do you object to those paragraphs, on what basis do

9  you object, and then I would turn to the Government and inquire

10 on what basis do they assert that these statements were made.

11         Now, I understand that your client may not have

12 recalled, but the question for the Court is, you know, what's

13 the basis for these, for these statements and why are they in

14 the pre-sentence report, so I'll ask again, is it your client's

15 position that he's requesting that you object to paragraphs 16

16 through 20.

17         MR. LEWIS:  Yes, Judge.

18         THE COURT:  That's your position.

19         MR. LEWIS:  I...

20         THE COURT:  It's either yes or no.

21         MR. LEWIS:  It is --

22         THE COURT:  I'm not interrogating you, but I need to

23 make a complete record.  If you're objecting to those

24 statements, I need to address them.  You're saying yes, and your

25 position is that your client doesn't recall ever making those

1  statements to -- in the presence of individuals identified -- an

2  individual identified as Witness No. 2.

3           MR. LEWIS:  Sixteen through 19, Judge.

4           THE COURT:  Okay.  So there's no objection to

5  paragraph 20.

6           MR. LEWIS:  That's correct.

7           THE COURT:  Okay.

8           And then I'll turn to the Government and I'll ask

9  what's the basis for the statements contained in paragraphs 16,

10 17, 18, and 20 as reflected in the pre-sentence report.

11          MR. LEWIS:  I'm sorry, Judge, 16, 17, 18, and 19.  I

12 have no objection to 20.

13          THE COURT:  Correct.  That's what I stated.  You're

14 objecting to paragraphs 16, 17, 18 and 19.

15          AUSA PERTZ:  Judge, each of those statements by

16 Witness 2 was as told to law enforcement, memorialized in

17 reports by law enforcement, and provided to the Defense.

18          I think in addition, it's fair to note that there are

19 corroborative pieces of evidence in the record.  For instance,

20 statements about ammunition would be corroborated by law

21 enforcement's discovery of ammunition, statements about firearms

22 and destructive devices would be corroborated by law

23 enforcement's discovery of those devices, and components for

24 remote detonation would be corroborated by law enforcement's

25 discovery of certain items, remote controls, et cetera, in that

1    same search.

2              THE COURT:  So is there any -- based -- this is based

3    on police reports that were part of the investigation.

4              AUSA PERTZ:  The statements are from FBI reports.

5    Yes.

6              THE COURT:  All right, so the Government seems to have

7    a good-faith basis for making those statements and, and the only

8    -- the Defendant in this case objects to those statements on the

9    basis that he never recalls making those statements to anyone.

10             Is that fair to say?

11             MR. LEWIS:  Yes.

12             THE COURT:  All right.  So I...although you have

13   objected to those statements in the pre-sentence report, I'm

14   going to overrule your objections on the basis that the

15   Government has a good-faith basis for making those statements

16   and for having those statements in the pre-sentence report.  All

17   right?  Let's proceed.

18             All right, Mr. Wynberg, have you had an opportunity to

19   read and review the pre-sentence report?

20             THE DEFENDANT:  Yes, your Honor, I have.

21             THE COURT:  And did you discuss the pre-sentence

22   report with your attorney?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  All right.

25             Your attorney raised multiple objections, which he

1  placed on the record, all right, and they've been addressed by

2  me, all right.  Other than those that have been raised by your

3  attorney, do you have any objections -- any other objections

4  with respect to the pre-sentence report that you wanted your

5  attorney to raise at sentencing?

6              THE DEFENDANT:  No, your Honor.  I do not.

7              THE COURT:  Okay.  So he addressed any and all

8  objections that you wanted him to raise during your sentencing;

9  is that correct?

10             THE DEFENDANT:  That's correct, your Honor.

11             THE COURT:  All right.

12             Mr. Wynberg, the Superseding Indictment, which was

13 filed on November 10th, 2020, charges you with one count of

14 manufacturing destructive devices in violation of 26 U.S.C.

15 § 5822, 5861(f), and 5871; one count of possession of

16 destructive devices in violation of 26 U.S.C. § 5861(d) and

17 5871; and one count of being a felon in possession of ammunition

18 in violation of 18 U.S.C. § 922(g)(1).

19             On September 29th, 2021, you pled guilty to Count II

20 pursuant to a plea agreement before Magistrate Judge McCarthy.

21 On January 31st, 2022, this Court issued an order accepting your

22 plea allocution.

23             All right, does the Government have any comments or

24 motions for the Court's consideration before I impose the

25 sentence upon the Defendant?

1          AUSA PERTZ:  The Government would like to make a brief

2    statement with your Honor's permission.

3          We believe that on the conference line today there are

4    several individuals whose lives have been affected by Mr.

5    Wynberg, and they have submitted statements for the Court's

6    consideration.

7          This series of events took place in northern Dutchess

8    County, and this is a place where there are woods, fields,

9    horses, houses that are very spread out from each other, a place

10   where people go for peace and quiet.

11         THE COURT:  It's often referred to as god's country.

12         AUSA PERTZ:  Heh, that it is.  But something very

13   inconsistent with god's country took place there.

14         People who are just living ordinary lives had their

15   peace shattered by the constant sound of gunfire, bullets, in

16   some cases coming into the side of a house, by the sound of

17   explosion, and these people's lives have been permanently

18   disrupted by these events.  They, in fear of what Mr. Wynberg

19   might do, have moved from their home, they've left their

20   property, places that they've lived for a very long time and had

21   to seek out new circumstances elsewhere, both because of the

22   emotional toll of living with this...the memories of not only

23   explosion, gunfire, but of theft, of the knowledge of danger,

24   and the fear that something else similar might happen to them in

25   the future.

 1              So for those reasons, the reasons stated in the PSR,

 2    and for the statements of those who Mr. Wynberg affected, we are

 3    seeking an above-guidelines sentence here.  We believe the

 4    issues are fully briefed and the items of dispute are few.  It's

 5    just a question of how much time is appropriate under 3553(a) to

 6    advance those goals, and we submit that a substantial period of

 7    incarceration is needed to protect the public and to deter the

 8    Defendant from ever doing this again.

 9              If the time he served for a weapons count was not

10    enough, then afterward he started making bombs, causing not only

11    issues with his neighbors, but also an issue for law enforcement

12    who had to approach this trailer containing explosive devices,

13    thousands of rounds of ammunition, and dig through piles and

14    piles of items searching for things that could explode and

15    change their lives for the worse, we submit that the danger and

16    the need for deterrence are strong enough that a substantial,

17    above-guidelines sentence is warranted.

18              THE COURT:  All right.  Thank you, Counselor.

19              Mr. Lewis, do you have any comments you'd like to make

20    on behalf of your client before the Court imposes the sentence

21    upon him?

22              MR. LEWIS:  Yes, if I may, Judge.

23              Judge, I've appeared in front of you a significant

24    amount of times, and some of those cases where I have appeared

25    in front of you were dealing with individuals who have had

1   significant mental health issues.  Nick Wynberg has significant

2   mental health issues.  And as I referenced in one of my

3   submissions, the fact that he was overprescribed Adderall and

4   had those medication -- excuse me, mental health issues, was, in

5   essence, a perfect storm, and if you look at it, we have a

6   forensic report that we submitted to the Court from a recognized

7   forensic psychiatrist who basically supports that proposition.

8           He had treatment for mental health from 2005 and the

9   Government came in and said, "well, he wasn't on Adderall before

10  the went to jail in 2016," and I came back and I showed you the

11  prescription medications that showed that he was, he was

12  receiving 100 milligrams of Adderall during the year 2015 and

13  2016, and then interestingly enough, he goes to jail for a

14  year-and-a-half on a Safe Act violation, that is, that he had a

15  rifle that had to be registered and it wasn't registered, and he

16  received that sentence.

17          And he was on parole, he was discharged early, he had

18  no disciplinary issues, everything was fine.  He gets out, he

19  resumes his mental health treatment, and once again, and I

20  submitted this to your Honor so you could see, that in 2019 and

21  2020, before he was arrested in July, he's receiving 120

22  milligrams of Adderall, which is the four times the recommended

23  adult dosage, maximum dosage, for treatment of ADHD.  And, you

24  know, if you add two and two together, the mental health issues,

25  plus the overprescription, as Bardet pointed out, of the

1 Adderall, it created this perfect storm of anxiety and paranoia

2 that led him to invent a persona that created this monster.

3            Now, if you, in fact, have any question -- number one,

4 he's been on disability benefits since 2011 for mental health

5 issues, he's been treated since 2005, and if you have any

6 question about his mental health, all you need to do is look at

7 the photographs that I included in my January 27th submission

8 and see this is what he was living in at the time of his arrest

9 in July of 2020.  Those were the conditions of this little

10 trailer that he lived in.  And they say a picture is worth a

11 thousand words.  Nothing is ever truer than you looking at those

12 photographs.  This individual was seriously mentally ill back in

13 July of 2020.

14            Now, what's happened since then?  He's incarcerated,

15 he's not receiving the stimulants, he has a medication protocol,

16 he's been a trustee for the last fifteen months, he's allowed to

17 work outside of his psychiatric block and go to kitchen and

18 clean the entire facility.  In fact, as you'll hear in a moment,

19 one of the things he's most proud of is the neatness of his cell

20 that he keeps, which is a model to the other inmates, so there

21 really cannot be any doubt in anyone's mind that Nicolaus

22 Wynberg was suffering from mental illness and the medication

23 that was given to him was overprescribed.

24            So where are we?  What do we have?  We have an

25 individual who obviously did something wrong, and people had a

1  right to believe that this was dangerous.  There's no proof,

2  there's nothing that I ever read, that there were any gunshots

3  fired at the house where either the landlord, her friend, or her

4  boyfriend lived in, okay?  There was, there was mention about

5  the trailer, okay, but not the house.  And there's nothing to

6  indicate in the FBI's painstaking review and collection of

7  materials from that squalid, filthy trailer that indicates that

8  the pipes could have been remotely detonated, so even though

9  there's a remote control and there's transistor radios and

10  things like that, battery packs, doesn't mean that it was ever

11  able to do that, and that's --

12            THE COURT:  Mr. Lewis, I have a question about that.

13            MR. LEWIS:  Sure.

14            THE COURT:  Isn't that indicative of the fact that he

15  was attempting, your client was attempting, to create a device

16  by which he could remotely detonate these, these explosives?

17  Isn't that a reasonable inference that the Court could make, or

18  that anyone would make, under these circumstances?

19            MR. LEWIS:  Except that you can't breathe reason into

20  mental illness, and from --

21            THE COURT:  Well, that's actually, that's actually the

22  point of the Government, though, that he's basically -- we have

23  a situation of an individual who, either as a result of his own

24  failure or the result of the doctors, is facing -- has mental

25  health issues, appears to be somewhat out of control based on

1  the comments that he's making to individuals that live nearby,

2  right?  He has what the Government might describe as an arsenal

3  of weapons that can result in serious injury to others,

4  including explosive devices.

5          MR. LEWIS:  Well --

6          THE COURT:  And he's attempting to create a device.

7          MR. LEWIS:  Judge, there are two firearms in there --

8  I'm sorry.

9          THE COURT:  One firearm is enough, two firearms puts

10 it pretty dangerous, and then he's got explosive devices and

11 he's in an area where there's, you know, other residents, right?

12 Nearby, right?  I mean, it creates a very scary scenario for

13 anyone.

14         MR. LEWIS:  No question about it.  No question about

15 it.  And that's, that's the reason why the FBI got involved,

16 that's the reason why there was a search warrant, that's the

17 reason why he was arrested, and that's the reason why we're

18 here.

19         THE COURT:  Right.

20         MR. LEWIS:  I get all that.

21         THE COURT:  But let me ask you this.  This is where, I

22 think, the Government is concerned.  He was previously found in

23 possession of an unlawful weapon.  He served, if I'm not

24 mistaken, anywhere from 16 months to two years.

25         MR. LEWIS:  Sixteen months, Judge.

1            AUSA PERTZ:  It was a little more than that.

2            THE COURT:  Well, I have approximately two years, but

3    the sentence was -- I think, was 16 months to 4 years.  I think

4    that was what he was sentenced to.  He served, by my

5    calculation, two years, and whether it's two years or 16 months

6    is of no moment.

7            MR. LEWIS:  He got one-and-a-third to three.

8            THE COURT:  But I think the Government's position

9    is...this did not deter him from continuing to engage in similar

10   conduct.  He was previously convicted of unlawful possession of

11   a weapon and he serves time.  One would hope that that would

12   serve as a deterrence, one would hope that that would serve as

13   the basis for him to control his mental health issues, and lo

14   and behold, what does he do?  He goes out and he gets -- he's in

15   possession of additional firearms and explosive devices and he

16   doesn't control his medical...

17           MR. LEWIS:  I'm sorry?

18           THE COURT:  His mental health issues.  He doesn't get

19   a hold or control his mental health issues.

20           And so the Government's position is, Judge, if his

21   prior sentence didn't serve as a deterrence, all right, don't

22   give this guy a break because he hasn't learned from his prior

23   mistakes, and, yet, you're asking me to give him a

24   below-guidelines sentence.  All right, the Government is asking

25   for an above-guideline, you're asking for a below-guideline

1 sentence, and I'm asking you why, why should I do that, why

2 should I, all right, a judge who's responsible for granting --

3 all right, imposing a sentence that is just and not higher than

4 necessary, all right?  That's the standard, all right.  But why

5 shouldn't I also take into consideration his prior history and

6 the fact that he poses a risk to this community that he lives

7 in, he posed a great risk upon the community.

8           So why should I impose a sentence below the guidelines

9 as you're requesting?

10           MR. LEWIS:  Because he was sick.  Because we see here

11 almost a test pattern.

12           In 2016, he's receiving 100 milligrams of Adderall.

13 He's sick, he's getting psychiatric treatment.  He gets

14 arrested.  He's not receiving Adderall in jail.  He gets an

15 early release from parole, early release from parole, good

16 conduct, no problems in jail, everything's fine, and then he's

17 still seeking medical treatment.  And what do we see again?

18 Stimulants.  And stimulants in the tune of four times of what

19 should have been prescribed and we're back to where we were.

20           So Nick Wynberg did it, he accepts responsibility for

21 doing it, but there's also a mitigation aspect to this whole

22 scenario recognizing that when people are sick, it's expected

23 they're going to get appropriate psychiatric help and follow

24 their directions, and all he did was follow directions of the

25 prescribed medication that was given to him.  And as I said

1 twice before today, this was the perfect storm.

2          And what do we have now?  We have in the last...lab

3 analysis -- in this lab analysis we have a controlled

4 circumstance where we see that since his arrest and up to now

5 he's had no disciplinary issues, and in my last submission to

6 you were eleven letters.  And I accept the fact where they're

7 coming from, they're not pillars of the community, but there was

8 a theme here, there was a theme of an individual who's

9 empathetic, who's willing to listen, who counsels them, who

10 tries to be kind, and we see that there are no issues.

11          He's not one -- you've had cases, so many cases,

12 Judge, you've had so many cases where individuals are

13 incarcerated and they wind up, you know, fighting in jail and

14 getting into trouble and passing kites and doing all sorts of

15 bad things.  You don't have that with this individual, so --

16 why, why don't we have that.  Well, is it because, is it because

17 that now he's getting the proper medical treatment and he is not

18 becoming a, a...a dangerous person?

19          I don't believe for a second as I sit here now and

20 speak to you that Nicolaus Wynberg is evil.  I believe that

21 everything he did was, in great part -- and I'm not just

22 speaking by myself, you've got a noted forensic psychiatrist who

23 specifically indicated that it wasn't a buildup of anger, but,

24 really, an attempt to create this persona.  And if you look at

25 my February 1st, 2022, submission, on page 2 I quote Dr. Bardet,

1  "overmedicated and without a proper support system in place, Mr.

2  Wynberg engaged in the conduct that led to his arrest.  His

3  actions were the materialization of psychologically defensive

4  maneuvers to deal with the anxiety, fear, and isolation he felt.

5  They were not, in my opinion, acts taken up as a buildup to

6  offensive and aggressive behavior.  Rather, his intent was to

7  appear invulnerable to the threats he perceived society

8  presented to him, threats borne out of ongoing symptoms of PTSD

9  and depression."

10         And the medication, I provided certain medical

11  information to the Court, when you have an overdose of these

12  stimulants, it can cause paranoia, it can cause anxiety, all

13  those things.

14         THE COURT:  I read that.  I read that.

15         MR. LEWIS:  So, you know, I totally understand your

16  Honor's responsibilities and probably the conflict that you're

17  experiencing right now.  We have a guy here who did some bad

18  things, and to the people that were living in the house that

19  allowed him to live at the trailer, they, they were really

20  upset.

21         I don't believe for a second that they moved because

22  of Nicolaus Wynberg.  I don't believe that for a second.  He was

23  arrested, he's off the property, he's in jail, he's continuously

24  been in jail, and if there was a sale of that property for any

25  reason, it wasn't because of Wynberg, and especially in light of

1  everything that's gone on in the last year-and-a-half with COVID

2  and the pricings that have gone up and the value of, of

3  properties, but I'm getting beyond myself.

4          I'm not trying to say what he did was right, I'm

5  saying what he did was wrong, but there is a mitigation

6  component here that has to, should be, considered by this Court

7  in making a fair and just sentence, sufficient, but not greater

8  than necessary, and we have the letters, we have the forensic

9  psychiatrist, we have the medical records to show that he was

10 taking all this stuff.

11         And...so you asked me the question, why should I, why

12 should I give him a below-guideline range, and the only answer I

13 can come come up with is because we are an enlightened society

14 that recognizes that people do things when they are ill.  And if

15 I come in and I look cachectic, I look like I've lost weight, I

16 have a pallid complexion, you can say "he doesn't look well, he

17 looks ill," but mental illness is an invisible disease.  People

18 can look perfectly normal and still be tremendously ill and

19 sick, and that's what happened in this case.  And unfortunately

20 we can't undo what had happened, but we can allow him an

21 opportunity to move on with his life and be able to prove to the

22 Court that he isn't a danger.

23         No matter what your sentence of incarceration is going

24 to be, you're going to tack on supervised release, and the

25 supervised release conditions will have to be, should be, that

1  he continues with mental health treatment and that he follows

2  his prescription directives and that he reports regularly and

3  all those things to ensure, to ensure the safety of the

4  community and to show that there is a punishment here, but it's

5  also tempered by the recognition that people who are sick do bad

6  things.

7          So with the letters, with the forensic report, with

8  the prescription medications that were there, and most

9  importantly, you looking at those photographs to see exactly

10 what he was living in at the time, I'm asking your Honor to, to

11 show leniency here and give him the opportunity to prove to you

12 that with the appropriate medical treatment, he can be a

13 responsible citizen as he once was.

14         Thank you, Judge.

15         THE COURT:  All right.  Just want to...I just have one

16 or two other questions for you.

17         One, your client's been in for 21 months or so?  Is

18 that correct?

19         MR. LEWIS:  No, sir.  He's been in since July of 2020.

20 I believe that at the end of this month, it will be eighteen.

21         THE COURT:  Oh, it's 18 months?  Okay.

22         MR. LEWIS:  Did I miscount?  Judge, I'm sorry, I went

23 to parochial school, so bear with me while I --

24         THE COURT:  So did I.  We share the same burden.

25 Maybe I was wrong.

TABITHA R. DENTE, RPR, RMR, CRR
(914)-390-4027

1           MR. LEWIS:  No, at the end of this month it will be 19

2    months.

3           THE COURT:  He went in, he was detained, I have, as of

4    July 2020.

5           THE DEPUTY CLERK:  Yes.

6           MR. LEWIS:  That's right, Judge.

7           And one thing I didn't mention, the entire time he's

8    been in, it's been COVID-land.

9           THE COURT:  All right, I miscalculated, you're right,

10   19 months.

11          Also, I was looking at the pre-sentence report...there

12   are mandatory conditions, the standard conditions...and then the

13   special conditions talk about outpatient treatment program, but

14   there's no reference to mental health treatment.

15          MR. LEWIS:  Judge, I just think that's a cut-and-paste

16   mistake.

17          THE COURT:  Yeah, no, no, just -- I just want to make

18   sure that the record is clear, all right.  I noticed that.  All

19   right, thank you, Mr. Lewis.

20          Mr. Wynberg, is there anything you'd like to say on

21   your own behalf before the Court imposes the sentence upon you?

22          THE DEFENDANT:  Yes, your Honor, I've written

23   something, and with your permission, I'd like to read it?

24          THE COURT:  Sure.

25          THE DEFENDANT:  Okay.

```
 1              THE COURT:  You can speak from the heart or the soul

 2   as they say.  I like music, so I like to -- when I say 'speak

 3   from the heart,' I usually say soul because I'm a very soulful

 4   person, I also love soul music.

 5              THE DEFENDANT:  Thank you.

 6              THE COURT:  But you can speak -- you can read your

 7   statement or you can read from your soul if you like.

 8              THE DEFENDANT:  I'll probably do a little bit of both

 9   here, your Honor.

10              Your Honor, during the time I've been incarcerated

11   I've had a lot of time to think and reflect on my situation.  It

12   is only recently that I saw the photographs of the trailer that

13   I was living in and it was really disturbing.  I was shocked and

14   confused by what I saw.  Shocked because I can't understand how

15   somebody could come to live in such a filthy, disgusting

16   situation, and confused because I realized that that person was

17   me, and, you know, I can't rectify who that person was with the

18   person that is here before you today.  It's in stark contrast,

19   really.

20              You know, as an inmate and a trustee on my cell block,

21   you know, not only am I reasonable for keeping both my personal

22   space clean, neat, and in good order, but I'm also responsible

23   for keeping the entire block clean and neat.  Several times a

24   day I have to clean it, disinfect it, and it's considered an

25   exemplary block.  It's often used as an example for visitors,
```

1  whether from the state or from the public, as is myself also

2  often used for the same reason, everything is clean and neat, in

3  its place, you know, again, just in stark contrast to the way

4  that I was living.  You know, I say all of this to tangibly

5  reinforce that the person that's sitting before you today is not

6  the same person who was living in that filthy, disgusting

7  trailer.

8           None of this excuses me in any way from the fact that

9  I broke the law, and I need to be punished for that.  You know,

10 unfortunately in the time leading up to my incarceration, with,

11 you know, my illness, combined with a lack of adequate

12 psychiatric care, really put me in a state that was delusional

13 and irrational, my thought process had eroded to the point where

14 I was being completely controlled by my fear and my anxiety of

15 this catastrophe that, you know, cognitively I had been aware

16 wasn't real, but it felt real, and, again, none of this changes

17 the fact that my actions and my behaviors were completely

18 unacceptable, and I take full responsibility for that.

19           At this point, you know, I...I have to strive to

20 recognize and admit my failings.  I can seek to balance those in

21 the future and, you know, both through my thoughts and my

22 actions, you know, try to find a safe, supportive, and stable

23 environment, to make sure that I have consistent and appropriate

24 psychiatric care, trying to make sure I have a community of

25 people around me to keep me in check and let me know if my

1  behavior is in any way becoming erratic or irrational or, you

2  know, delusional.  You know, I'm really going to devote myself

3  to finding that kind of community.

4          I have a career planned for myself, I think I wrote to

5  you in a letter previously.  My goals are really very simple.  I

6  need to deal with my mental health situation first and foremost,

7  get it under control, and when I've done so, move forward and

8  get off of disability and get myself back into a productive

9  life, and after that, I really don't need much, you know.  I --

10 you know, ridiculous as it sounds, I basically just, you know,

11 I'd like to be in love and I'd like to have a golden retriever,

12 and that's about all I want in this world.  And that's -- you

13 know...whatever community I'm lucky enough, blessed, to call

14 home, to be a positive member of that community, you know, some

15 sort of redemption, you know; whether, you know, it's redemption

16 through the people that are in my life or redemption through a

17 higher power or whatever the case may be, but...I really...can

18 tell you with all of my heart, like...I won't let you down

19 because letting -- it's about letting myself down, you know.

20         I've developed a very strong faith in the time that

21 I've been incarcerated, and this is about letting myself down or

22 picking myself up.  I only have two choices.  I can't let myself

23 down again.  I'm getting older, you know, this is kind of my

24 last chance to really build something positive for myself, and

25 it's now or never, and I have every intention of building

1    something positive for myself.

2              I think that's about -- I think that's about it, your

3    Honor.   Thank you for letting me speak.

4              THE COURT:   All right, thank you, Mr. Wynberg.   I'm

5    going to say a couple things.

6              Number one, I think you were...believe it or not, I

7    think you were lucky that you were able to go to a facility that

8    addressed mental health issues.   If there's one flaw in our

9    criminal justice system, it's that it's ill-equipped to address

10   the issue of mental health problems.   I think most individuals

11   that go through the criminal justice system by way of

12   incarceration, many of them, or a vast majority of them, suffer

13   from mental health issues and for the most part, it goes

14   unaddressed.   Your attorney can probably better address that

15   than I can, but you are, you are lucky that you went to a

16   facility that afforded you the opportunity to get a better

17   handle on your mental health issue and to address your -- you

18   know, the medication issue that you were facing.

19             But I think you're right, that if you don't get a

20   handle of your mental health issues and you don't address it

21   head on, the sad commentary is that if you don't do that, the

22   likelihood is that you will probably be back before me or

23   another judge facing a similar situation, but I hope that that's

24   not the case, so I think you are taking some positive steps in

25   that regard, and I hope that you continue to do so.   All right,

1  let's move on.

2          Before I do that, I just want to make sure that the

3  parties had agreed, with respect to forfeiture, that it's my

4  understanding of the plea agreement that Mr. Wynberg was

5  agreeing to forfeit to the United States all firearms that were

6  involved in this matter, that that was part of the plea

7  agreement.

8          Is that right?

9          AUSA PERTZ:  Yes, your Honor, and before the

10 proceeding began, Defense Counsel passed me a document signed by

11 him and by the Defendant which is a Waiver of Timely Notice

12 form, allowing the FBI to administratively forfeit the property

13 that's set forth in Exhibit A to the plea agreement and is

14 listed as Attachment A to this form, and it's the Government's

15 understanding that this would satisfy the Defendant's forfeiture

16 obligation.

17         THE COURT:  And your client is consenting to that, Mr.

18 Lewis; is that correct?

19         MR. LEWIS:  Yes, Judge.  We signed it right before the

20 proceeding.  It was given to me today.

21         THE COURT:  Okay.  All right.  Just wanted to make

22 sure that the record was clear.

23         All right, in accordance with the decision by the

24 Supreme Court in *United States v. Booker*, while the United

25 States sentencing guidelines are not mandatory, this Court

1   nonetheless must consult those guidelines and take them into

2   account when sentencing.  Therefore, this Court has considered

3   the findings of fact stated in the pre-sentence report, as well

4   as the guidelines analysis and recommendations contained

5   therein.  The Court has weighed this information, along with the

6   factors listed in 18 U.S.C. § 3553(a), in coming to its final

7   sentencing decision.

8            The Court adopts the factual recitation in the

9   pre-sentence investigation report.  The pre-sentence

10  investigation report includes a computation as Mr. Wynberg's

11  criminal history falls into category 2 and his offense level

12  amounts to 21.  The guidelines sentence for the offense level

13  and criminal history category is 41 to 51 months imprisonment,

14  to be followed by one to three years of supervised release.  In

15  addition, the applicable fine range is $15,000 to $150,000.

16  Restitution is not applicable, forfeiture is to be determined,

17  and the applicable special assessment is $100.

18           Mr. Wynberg, you have been found guilty of one count

19  of possessing destructive devices in violation of 26 U.S.C.

20  §§ 5861(d) and 5871.  The Probation Office has recommended that

21  the Court impose a sentence of 41 months of incarceration, to be

22  followed by 2 years of supervised release.  The Probation Office

23  noted that for this offense you would pay a special assessment

24  of $100 in accordance with 18 U.S.C. § 3013 and has recommended

25  that no fines be imposed.

```
 1              (Off-the-record discussion)
 2              THE COURT:  Sub-section (a)(1) of 18 U.S.C. § 3553
 3  requires that courts take into consideration the nature and
 4  circumstances of the offense and history and characteristics of
 5  the defendant.
 6              Sub-section (a)(2) of 18 U.S.C. § 583 --
 7              THE DEPUTY CLERK:  Hold on one second.
 8              (Off-the-record discussion)
 9              THE COURT:  Sub-section (a)(2) of 18 U.S.C. § 3553
10  requires that the Court consider the need for the sentence to
11  promote the objectives of the criminal justice system, namely
12  punishment, specific and general deterrence, and rehabilitation.
13  The Court must also consider the kinds of sentences available,
14  the sentencing guidelines, the pertinent policy statements, the
15  need to avoid unwarranted sentencing disparities, and the need
16  to provide restitution to victims.
17              I've considered the arguments made by both sides and
18  the information provided by the parties, including Mr. Wynberg's
19  acceptance of responsibility for his actions, the nature and
20  circumstances of the crime, his prior criminal history, his
21  history and characteristics, and the seriousness of his crime.
22  Taking into account the nature and circumstances of the offense
23  and the history and characteristics of the Defendant and
24  considering all of the factors listed in 18 U.S.C. § 3553(a),
25  this Court finds that a sentence of 24 months imprisonment to be
```

1  followed by a term of three years supervised release is

2  reasonable and appropriate and that such terms are sufficient,

3  but not greater than necessary to promote the proper objectives

4  of sentencing.

5         In addition, the superseding indictment includes a

6  forfeiture allegation and states Mr. Wynberg shall forfeit to

7  the United States any and all firearms involved in this offense

8  pursuant to Title 26 U.S.C. § 5872 and Title 28 U.S.C. § 2461,

9  and as previously indicated in the record, there is a document

10 that was presented by the Government which has been executed by

11 Mr. Wynberg and his counsel.

12        The Defendant is ordered to pay to the United States a

13 mandatory special assessment of $100 which shall be due

14 immediately, and finally, based on the pre-sentence report

15 recommendation, I will impose no fine.

16        Mr. Wynberg, upon your release from custody, you shall

17 be placed on supervised release for a period of 3 years.  During

18 your term of supervised release, you must comply with the

19 mandatory conditions of supervision listed on page 20 of the

20 pre-sentence report, the standard conditions of supervision

21 listed on pages 20 through 21 of the pre-sentence report, and

22 the special conditions of supervision listed on pages 21 through

23 22 of the pre-sentence report while on supervised release.

24        You must also participate in an outpatient mental

25 health treatment program approved by the United States Probation

```
1   Office.  You must continue to take any prescribed medication

2   unless otherwise instructed by the healthcare provider.  You

3   must contribute to the cost of services rendered based on your

4   ability to pay and the availability of third-party payments.

5   The Court authorizes the release of available psychological and

6   psychiatric evaluations and reports, including the pre-sentence

7   investigation report, to the healthcare provider.

8           Mr. Wynberg, do you understand each of these things?

9           THE DEFENDANT:  I do, your Honor.

10          THE COURT:  Do you understand the conditions, though?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  All right.  Upon your release from

13  custody, you must report to the nearest probation office within

14  72 hours.  The Court recommends that you be supervised by the

15  district of residence.  This sentence as stated is imposed.

16          Mr. Wynberg, you have the right to appeal your

17  sentence.  Any notice of appeal must be filed within 14 days

18  after the entry of judgment, so if you wish to appeal, you must

19  advise your attorney to prepare and file a notice of appeal

20  immediately.  If you're unable to pay the cost of an appeal, you

21  have the right to apply for leave to appeal in forma pauperis,

22  meaning as a poor person.  If you make such a request, the clerk

23  of the court must immediately prepare and file a notice of your

24  appeal on your behalf.

25          Do you understand your right to appeal to the extent
```

```
 1  it may exist?

 2          THE DEFENDANT:  Yes, your Honor, I do.

 3          THE COURT:  All right.  Are there any remaining counts

 4  in underlying information or indictments that need to be

 5  dismissed or addressed at this time?

 6          AUSA PERTZ:  Yes, the Government moves to dismiss

 7  Counts I and III of the indictment.

 8          THE COURT:  All right.  Taking there is no opposition,

 9  I'm going to grant that application.

10          Is there any recommendations that Counsel would like

11  the Court to make?

12          MR. LEWIS:  Yes, Judge.

13          He's currently -- I'd ask that if their commitment

14  papers reflect that if he's transferred from the Westchester

15  County Jail that he's currently taking 4 milligrams daily of

16  Klonopin and 20 milligrams of Lexapro and that where -- if they

17  send him somewhere else, that he be sent to a facility where

18  they can be provide mental health treatment and that his

19  medication will follow him.

20          THE COURT:  So I make the recommendation that should

21  he be transferred from the Westchester County Jail that he be

22  sent to a facility that provides mental health treatment and

23  that all his medical records, including mental health records,

24  and his prescriptions for -- related to his health be forwarded

25  as well, and that he be allowed to take his mental health
```

 1  medication.

 2          Anything else with respect to potential location?

 3          MR. LEWIS:  Not -- no, Judge.

 4          THE COURT:  You don't want him to be in a facility

 5  close to --

 6          MR. LEWIS:  He has no family.

 7          THE COURT:  All right, but still, he may want to stay

 8  close to where he resides.

 9          MR. LEWIS:  Fine.  I'd make that application.

10          THE COURT:  All right, and what county is that?

11          MR. LEWIS:  Westchester.

12          THE COURT:  Okay.

13          Anything further?

14          MR. LEWIS:  No, Judge.

15          THE COURT:  All right.  Make sure that your attorney

16  says it's a good idea for you to speak, okay?  I don't --

17          THE DEFENDANT:  I just want to let you know that I'm

18  not going to let you down.  I mean that with every fiber of my

19  being.  I'm not going to let you down.

20          THE COURT:  Well, I hope that's the case, Mr. Wynberg.

21  You know, I'm hopeful that you have a handle of your mental

22  health issues.

23          Look, we all have problems.  You know, it's a shame

24  that this society kind of...they don't -- we don't want to speak

25  about mental health issues, you know, it's taboo, it's a thing

1  that people are ashamed of, and I think that needs to be -- that

2  needs to change.  You know, I hope for your sake that you're

3  able to deal with it appropriately.  I sincerely hope you don't

4  ever have to come before another judge, you know.

5          And maybe it's wrong of me to say this, but if you

6  need to, to, to...you know, find religion or, or there's these

7  ethical societies that are humanists, you know, they're big on

8  morals and moral codes and so forth, whatever the case may be,

9  if that's what helps you maintain a healthy lifestyle and mental

10 health lifestyle, you know, I hope that you find that.  We all

11 need help.  We all need help.  You know, I need help, heh, all

12 right?  Which is why I go home and sometimes I de-stress by

13 talking to my wife or I just go home and walk my dog, and as

14 soon as I get home -- I mean, I try to walk her as soon as I get

15 home, because we live in a stressful society, so I hope you're

16 able to find that, and I sincerely hope that you don't ever have

17 to come before another judge.

18          THE DEFENDANT:  Bless you, your Honor.

19          THE COURT:  You know, best of luck to you.

20          THE DEFENDANT:  Thank you.

21          THE COURT:  You know, the agents did a good job.

22 Whether or not they agree with me, you know, all I can say is

23 I'm trying to do the best I can with my job in setting

24 appropriate sentences, but, you know, I hope for the best.

25          All right?

```
1              THE DEFENDANT:  Thank you.

2              THE COURT:  Anything further?

3              MR. LEWIS:  No, sir.

4              THE COURT:  Sure.  Gina, we can recess.  Good luck to

5    you, sir.

6              THE DEFENDANT:  Thank you.

7              MR. LEWIS:  Thank you, Judge.

8              THE DEPUTY CLERK:  This Court is in recess.

9              Certified to be a true and accurate transcript.

10

11             _____

12                  TABITHA DENTE, SR. COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25
```